499 S.E.2d 480

**STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY, Appellant,**

v.

**Mary BOOKERT and Michael Bookert, Respondents.**

No. 2749.

Court of Appeals of South Carolina.

Submitted Nov. 4, 1997.

Decided Nov. 17, 1997.

Refiled Feb. 23, 1998.

222

John U. Bell, III, C. Mitchell Brown, and John A. Ecton, all of Nelson, Mullins, Riley & Scarborough, Columbia, for appellant.

H. Patterson McWhirter, of McWhirter, Bellinger & Associates, Columbia, for respondents.

## ORDER WITHDRAWING AND SUBSTITUTING OPINION

PER CURIAM:

After careful consideration of the Petition for Rehearing, the Court hereby withdraws the original opinion and substitutes the following opinion. The Court is unable to discover and material fact or principle of law that has been either overlooked or disregarded and, hence, there is no basis for granting a rehearing. It is, therefore, ordered that the Petition for Rehearing be denied.

/s/ Carol Connor, J.

/s/ Ralph King Anderson, J.

/s/ Thomas E. Huff, J.

ANDERSON, Judge:

This is a declaratory judgment action in which an insurer, State Farm Mutual Automobile Insurance Company (State Farm), seeks a judicial determination that the policy issued by State Farm to Mary Bookert does not provide underinsured motorist coverage for injuries Michael Bookert received as a result of a shooting in the parking lot of McDonald's. The Bookerts asserted coverage was provided under the insurance

policy. The trial court granted the Bookerts' motion for summary judgment concluding the underinsured motorist provisions of the policy provided coverage for the bodily injuries suffered by Michael Bookert. State Farm appeals. We affirm.[1]

## STIPULATED FACTS

For purposes of cross motions for summary judgment, the parties entered into the following stipulation of facts:

1. Michael Bookert seeks benefits as an insured under his mother, Mary Bookert's, underinsured motorist insurance policy coverage, Policy No. 3210–390–40C.

2. Michael Bookert is an insured under Policy No. 3210–390–40C as a general matter, because he is a "relative" living with the named insured at the time of the incident involved in this case which led to his injuries.

3. No car belonging to Mary Bookert is involved in this matter.

4. On the night of June 6, 1993, Michael Bookert and three other individuals were riding in a Toyota vehicle driven by one of Michael Bookert's friends.

5. Michael Bookert and his friends stopped at Hardee's Restaurant located at 5417 Forest Drive, Forest Acres, near Fort Jackson.

6. At this time, two soldiers from Fort Jackson and a group of approximately fifteen (15) young men became involved in a dispute.

7. After the dispute was broken up, the two soldiers and an additional soldier (all three soldiers are hereinafter referred to as "assailants"), traveled in the Tracker to the McDonald's restaurant located at 1024 Elmwood Avenue on the night of June 6, 1993, and had with them a pistol-grip pump shotgun and a nine millimeter handgun.

8. The assailants then began riding through the McDonald's parking lot, searching for the group of young men with whom they had been in a dispute.

---

1. Because oral argument would not aid the Court in resolving the issues, we decide this case without oral argument.

9. Michael Bookert and his friends had previously arrived at the McDonald's restaurant on Elmwood, and some of the same individuals who were in the group of approximately fifteen (15) at the Hardee's near Fort Jackson were also at this McDonald's at this point in time.

10. As he was about to enter the door to the restaurant, Michael Bookert heard three individuals, later known to him as the three aforementioned assailants, yelling and "talking trash." Michael Bookert was unsure at this precise point in time exactly to whom the yelling and "trash talking" was directed.

11. Michael Bookert turned to look in the direction of the yelling and "trash talking." The Geo Tracker was, at this precise time, stopped in the McDonald's restaurant parking lot, with the motor running, in the traffic lane that circles the building.

12. Michael Bookert saw one of the assailants standing in the back of the Geo Tracker brandishing a pistol-grip pump shotgun.

13. The front seat passenger assailant was seen by Michael Bookert at this same time brandishing a nine millimeter handgun.

14. Michael Bookert was "stunned" by what he saw and stood at the entrance to the restaurant watching the assailants.

15. The Tracker jerked forward, and as the assailant holding the shotgun fell out of the vehicle, he fired into a group of people at the restaurant, although Michael Bookert was missed by this gunfire.

16. An instant later while said Geo was still moving forward, the soldier in the front passenger seat of the Tracker fired the nine millimeter, hitting Michael Bookert with two bullets, one in each leg.

17. The injuries Michael Bookert sustained resulted from the nine millimeter handgun fired by the assailant in the front seat.

18. The Tracker was used for the transportation of the assailants and their weapons as well as their arrival at Bookert's location at McDonald's.

19. The parties know of no facts that would have prevented the assailants from parking the Tracker, getting out of the Tracker, walking over to Michael Bookert, and shooting him as he stood in the entrance of the McDonald's restaurant.

20. The assailants then escaped from the McDonald's parking lot in the Tracker, with the exception of the assailant with the shotgun, who escaped from the McDonald's parking lot on foot.

21. The two assailants who fled the scene in the Tracker were immediately captured by the police a few blocks away from the McDonald's restaurant.

22. The third assailant who fled on foot was arrested and charged a few days later.

23. All three assailants were charged with and convicted of various criminal violations, including assault and battery with intent to kill, aggravated assault, and accessory after the fact to a felony.

### PROCEDURAL BACKGROUND

Based on the stipulated facts, both parties moved for summary judgment.[2] The court granted summary judgment in the Bookerts' favor and held the underinsured motorist provisions of the policy issued by State Farm to Mary Bookert were inconsistent with S.C.Code Ann. § 38–77–160 (Supp. 1996). The court reformed the policy by substituting the words "ownership, maintenance, or use" for the words "operation or ownership" in the portion of the policy relating to underinsured motorist coverage. The policy initially provided underinsured motorist coverage as follows:

We will pay damages for bodily injury or property damage an insured is legally entitled to collect from the owner or driver of an underinsured motor vehicle. The bodily injury or property damage must be caused by accident arising out

---

2. The insurer for the driver and owner of the Geo Tracker accepted liability and paid its limits in the amount of $15,000 to Michael Bookert.

of the *operation or ownership* of the underinsured motor vehicle. (emphasis added).[3]

Additionally, the court determined Bookert's injuries arose out of the "ownership, maintenance, or use" of a motor vehicle. Finally, the court concluded the underinsured motorist provisions of the policy provided coverage for the gunshot injuries sustained by Michael Bookert. State Farm filed a motion for reconsideration, which was denied.

## ISSUES

I. Did the trial court err in reforming the insurance policy when it found the language relating to underinsured motorist coverage inconsistent with S.C.Code Ann. § 38–77–160 (Supp.1996)?

II. Did the trial court err in finding underinsured motorist coverage was available to Michael Bookert under the reformed policy?

III. Did the trial court err in considering an affidavit submitted by the Bookerts in support of their summary judgment motion where the case was submitted on stipulated facts?

## LAW/ANALYSIS

### I. REFORMATION OF POLICY

State Farm contends the trial court erred in reforming the contractual language of the policy when it found the policy language inconsistent with S.C.Code Ann. § 38–77–160 (Supp. 1996).

In its motion for summary judgment, State Farm conceded the bodily injury incurred by Michael Bookert was an "accident" within the terms of its policy. However, State Farm argued the bodily injury did not arise out of the *"operation"* of the underinsured motor vehicle, nor did the bodily injury arise out of the *"use."* In *Hite v. Hartford Accident & Indem. Co.,* 288 S.C. 616, 344 S.E.2d 173 (Ct.App.1986), this Court

---

3. Notably, the State Farm policy utilizes the same "operation or ownership" language in describing the uninsured motor vehicle coverage.

recognized the term "use" was broader than the term "operate" and explained:

> It has been held that the "use" of an automobile involves its employment for some purpose of the user, while its "operation" involves the user's direction and control of its mechanism as its driver for the purpose of propelling it as a vehicle. One who operates a motor vehicle obviously uses it, but one can use a motor vehicle without operating it; an automobile is being used, for example, by one riding in it, although another is driving or operating it.

*Hite*, 288 S.C. at 619, 344 S.E.2d at 175 (citations omitted).

In South Carolina, automobile insurance policies are statutorily required to contain liability and uninsured motorist coverage in certain basic limits. S.C.Code Ann. §§ 38–77–140 and –150 (Rev.1989 and Supp.1996). South Carolina law mandates that no automobile insurance policy may be issued unless it contains (1) a provision insuring the persons defined as insured against loss from the liability imposed by law for damages arising out of the "ownership, maintenance, or use" of these motor vehicles and (2) an uninsured motorist provision to protect against damages an insured is legally entitled to recover which "arise out of the ownership, maintenance or use" of an uninsured vehicle. S.C.Code Ann. §§ 38–77–140 and –150 (Rev.1989 & Supp.1996).

■ The initial policy language—"operation or ownership"—is inconsistent with the legislative intent behind S.C.Code Ann. § 38–77–160 (Supp.1996). That section provides:

> Automobile insurance carriers shall offer, at the option of the insured, uninsured motorist coverage up to the limits of the insured's liability coverage in addition to the mandatory coverage prescribed by Section 38–77–150. Such carriers shall also offer, at the option of the insured, underinsured motorist coverage up to the limits of the insured liability coverage to provide coverage in the event that damages are sustained in excess of the liability limits carried by an at-fault insured or underinsured motorist or in excess of any damages cap or limitation imposed by statute. If, however, an insured or named insured is protected by uninsured or underinsured motorist coverage in excess of the basic limits,

the policy shall provide that the insured or named insured is protected only to the extent of the coverage he has on the vehicle involved in the accident.

The statute recognizes the insurer providing the underinsured coverage has the right to appear and defend in the name of the underinsured motorist in any action which may affect its liability and has thirty days after service of process on it in which to appear. *Id.* Further, in the event the automobile insurance carrier for the putative at-fault insured chooses to settle in part the claims against its insured by payment of its applicable liability limits on behalf of its insured, the underinsured motorist carrier may assume control of the defense of the action for its own benefit. *Id.*

■ Because underinsured motorist coverage is intended to provide coverage where the at-fault driver's liability coverage is insufficient, we conclude the legislature intended for underinsured motorist coverage to provide the same type of coverage as liability coverage. Specifically, underinsured motorist coverage should be available for "damages arising out of the ownership, maintenance, or use" of a motor vehicle. *See* S.C.Code Ann. § 38–77–140 (Rev.1989). In light of these statutory provisions, it is logical to conclude underinsured motorist coverage should provide the same spectrum of coverage as liability coverage. If this were not so, then an insured might collect liability limits from an at-fault, underinsured driver, but then be denied underinsured motorist benefits because, while the accident might have arisen out of the "ownership, maintenance, or use" of a motor vehicle, it did not arise out of the more narrow "operation or ownership" of the vehicle as the State Farm policy requires.

■ Accordingly, the trial court did not err in reforming the language of the State Farm policy to read "ownership, maintenance, or use," in place of "operation or ownership." As a result, underinsured motorist coverage is available under the reformed policy for any of Michael Bookert's injuries which arose out of the "ownership, maintenance, or use" of a motor vehicle.

## II.  COVERAGE UNDER THE POLICY

State Farm argues the trial court erred in concluding the reformed policy provided coverage for the gunshot injuries sustained by Michael Bookert because they arose out of the "ownership, maintenance, or use" of the underinsured vehicle.

■ In *Wausau Underwriters Ins. Co. v. Howser,* 309 S.C. 269, 422 S.E.2d 106 (1992), our Supreme Court articulated a two-pronged test for determining when an injury arises out of the "ownership, maintenance, or use" of an uninsured vehicle. First, the party seeking coverage must establish a "causal connection between the vehicle and the injury." *Howser,* 309 S.C. at 272, 422 S.E.2d at 108. *See also Home Ins. Co. v. Towe,* 314 S.C. 105, 441 S.E.2d 825 (1994) (test for determining whether injury arose out of use of vehicle turns on causal connection between vehicle and injury). Second, there must exist no act of independent significance breaking the causal link. *Howser, supra.* In *Canal Ins. Co. v. Insurance Co. of North America,* 315 S.C. 1, 431 S.E.2d 577 (1993), the Court added a further requirement:  it must be shown the vehicle was being used for transportation at the time of the assault.

### A.  Causal Connection

State Farm claims the trial court erred in finding a causal connection between the use of the underinsured vehicle and the gunshot injuries sustained by Bookert because the Geo Tracker merely provided the assailants with transportation to the situs of the shooting.  We disagree.

■ The first prong of the test for determining whether an injury arose out of the "use" of a vehicle requires a "causal connection between the vehicle and the injury." *See Howser, supra.* The causal connection is established where it can be shown the vehicle was an "active accessory" to the assault. *Id.* at 273, 422 S.E.2d at 108.

In *Howser, supra,* our Supreme Court held uninsured motorist coverage was applicable where an insured was injured when she was pursued, threatened, and then shot by an unknown assailant in a car. At the time of the shooting, the insured was driving her vehicle when the unknown assailant began following her and then "bumped" the back of her

vehicle with his automobile. The assailant pulled alongside Howser and threatened her with a gun while attempting to get her to pull over. When Howser tried to escape in her vehicle, the assailant fired several shots at her vehicle and she was wounded.

The crucial issue in the *Howser* case was whether the injuries sustained by Howser arose out of the "ownership, maintenance, or use" of the assailant's vehicle. The Court determined there was a sufficient causal connection between the use of the assailant's vehicle and Howser's injuries where the assailant's vehicle was an "active accessory" to the ongoing assault. The Court explicated:

> The causation required is something less than proximate cause and something more than the vehicle being the mere site of the injury. . . .
>
> In the case at bar, it is apparent that the unknown vehicle was an active accessory to this assault. This is not a case in which the assailant merely used the vehicle to provide transportation to the situs of the shooting as was found in *Nationwide Mut. Ins. Co. v. Brown,* 779 F.2d 984 (4th Cir.1985). Nor is it a case where the assailant happened, incidentally, to be sitting in a stationary vehicle at the time of the attack. Only through use of his vehicle was the assailant able to closely pursue Howser, thereby enabling him to carry out the pistol assault. The gunshot was the culmination of an ongoing assault, in which the vehicle played an essential and integral part. Additionally, only a motor vehicle could have provided the assailant a quick and successful escape. Thus, we find a sufficient causal connection exists between the use of the assailant's vehicle and Howser's injuries.

*Howser,* 309 S.C. at 272–73, 422 S.E.2d at 108. After finding causation, the Court held it must determine if an act of independent significance occurred breaking the causal link. *Id.* The Court concluded there was no act of independent significance which broke the causal link as "the unknown driver's use of his vehicle and the shooting were inextricably linked as one continuing assault." *Id.* at 274, 422 S.E.2d at 109.

In *Home Ins. Co. v. Towe*, 314 S.C. 105, 441 S.E.2d 825 (1994), the South Carolina Supreme Court considered whether injuries received by a victim when he was struck by a bottle thrown by a passenger in a passing vehicle arose out of the "ownership, maintenance or use" of Towe's automobile. The passenger threw the bottle from the moving vehicle at a road sign. However, he missed the sign and the bottle shattered on the steering wheel of a tractor being driven by the victim, who sustained serious injuries. The *Towe* Court explained:

> The use of the automobile placed Alexander in the position to throw the bottle at the sign and the vehicle's speed contributed to the velocity of the bottle increasing the seriousness of McClaskey's injuries. As in *Wausau*, the automobile was an active accessory that gave rise to the injuries. Therefore, we find that the Court of Appeals did not err in holding that a causal connection exists between the use of Towe's automobile and McClaskey's injuries.
>
> . . . .
>
> The use of the automobile and Alexander's throwing of the bottle were, as in *Wausau*, "inextricably linked" as one continuing act. Accordingly, there was no act of independent significance that broke the causal connection between the use of the automobile and McClaskey's injuries.

*Towe*, 314 S.C. at 107–08, 441 S.E.2d at 827 (citations omitted).

■ Here, the entire incident was a shooting by the occupants of the Tracker against a group of people with whom they had the initial altercation. Besides transporting the assailants and their weapons to the scene of the shooting, the vehicle served as a "launching pad" for the assault. The gunman's car was not the situs of the accident nor was it merely the means by which the assailant traveled to the situs. It was the "launching pad" for the attack. Further, the vehicle allowed the assailants to circle the McDonald's restaurant while seeking out their targets. The vehicle also put the assailants in the position to shoot and then escape quickly and easily. Two of the assailants, including the one who shot Bookert, used the vehicle to immediately flee the scene. *See Howser, supra* (Court held only motor vehicle could have provided assailant a quick and successful escape). Further-

more, the automobile was in motion when the shots which injured Michael Bookert were fired.

We conclude the Geo Tracker was an "active accessory" to the assault sufficient to constitute a causal connection.

## B. Act of Independent Significance

State Farm maintains the trial court erred in finding the intentional firing of the handgun was not an act of independent significance which broke the causal link between the underinsured automobile and the assault. State Farm claims the assault was wholly independent of and remote to the use of the underinsured vehicle. We disagree.

The second prong of the test for determining whether an injury arose out of the "use" of a vehicle requires there must exist no act of independent significance breaking the causal link. *Howser, supra.* In determining this element, the use of the automobile and the assault must be "inextricably linked" as one continuing act. *Id.; Towe, supra.*

State Farm asserts the case *sub judice* is analogous to *Carraway v. Smith,* 321 S.C. 23, 467 S.E.2d 120 (Ct.App.1995). In *Carraway,* this Court considered the extent of coverage under the uninsured motorist provision of an automobile insurance policy. The victim was injured by broken glass when a bullet struck his windshield as he sat at an intersection. The bullet was fired by the driver of an uninsured vehicle which had stopped in front of the victim's car. The driver had exited the vehicle and engaged in conversation with another person on the sidewalk. The victim remained in his vehicle stopped behind the assailant's car. After talking for several minutes, the driver pulled out a gun and began shooting at the person on the sidewalk. One of the bullets hit the victim's windshield.

In applying the test enunciated by our Supreme Court in *Howser,* this Court held:

> We believe the trial judge erred in finding a causal connection between Smith's use of the red vehicle and Carraway's injuries. Smith exited the car and carried on a conversation with a third person for several minutes before the shooting occurred. Even if the use of the car and the shooting were connected, that link was broken by Smith's

actions. Unlike the facts in *Wausau*, there was no ongoing use of a vehicle in this case to carry out the attack.

. . . .

We decline to extend the reasoning of the *Wausau* case to this fact situation. We hold that Carraway's injuries were caused by an independent act wholly separate from the use of the vehicle.

*Carraway*, 321 S.C. at 26, 467 S.E.2d at 121–22.

*Carraway* is distinguishable from the case at bar. The *Carraway* attack seemed to be on the "spur of the moment." Moreover, the vehicle was not part of the attack plan and played almost no role in the assault. In contrast, the assault here was a shooting in which the Tracker played an indispensable role. Furthermore, *Carraway* involved an assailant standing outside a stationary vehicle. This case involves an assailant inside a moving vehicle that played a pivotal role in the assault. The Geo Tracker was *moving* at the time the weapon which injured Bookert discharged.

In its brief, State Farm argues the criminal act of shooting a gun at another with the intent to harm or kill is an act which should break any causal connection between the use of an automobile and the resulting injuries. This argument is unpersuasive. If the act of firing a gun is enough to establish an intervening cause, then the Court in *Howser* could not have reached the conclusion that it did. In *Howser*, the assailant's act of firing his weapon from a moving car was not enough to break the causal link between the vehicle and the assault.

■ To the extent State Farm argues for and seeks a re-examination of the *Howser* opinion, this Court is bound by existing precedent of the South Carolina Supreme Court. *McKenney v. Jack Eckerd Co.*, 299 S.C. 523, 386 S.E.2d 263 (Ct.App.1989), *rev'd on other grounds*, 304 S.C. 21, 402 S.E.2d 887 (1991) (Court of Appeals has no authority to overrule or modify previous decisions of Supreme Court). Moreover, when determining whether the injury arose out of the "use" of the vehicle, no distinction is made as to whether the injury resulted from a negligent, reckless, or intentional act. *Home Ins. Co. v. Towe*, 314 S.C. 105, 441 S.E.2d 825 (1994). *See also Chapman v. Allstate Ins. Co.*, 263 S.C. 565, 211 S.E.2d 876 (1975) (when insured is intentionally injured and injury is as to

him unforeseen and not result of his own misconduct, general rule is that injury is accidentally sustained within meaning of ordinary accident insurance policy and insurer is liable therefor in absence of policy provision excluding such liability).

Here, the use of the automobile and the assault are "inextricably linked" as one continuing act. *See Howser, supra.* The assailants used the vehicle to arrive at the scene, to circle the parking lot searching for the group with which they had a previous encounter, and to travel in while shooting Bookert. The vehicle began to move forward immediately before the shots were fired and was moving when the assault occurred. After the shooting, two of the assailants fled the scene in the Tracker. Hence, no act of independent significance broke the causal link between the use of the vehicle and the assault.

### C. Transportation Limitation

■ State Farm asserts the trial court erred by failing to consider whether the underinsured vehicle was being used for transportation purposes at the time of Bookert's injury. We disagree.

In *Howser, supra,* the Court did not specifically address whether the vehicle must be used for transportation purposes at the time of the injury to be included in the mandated coverage. Thereafter, in *Canal Ins. Co. v. Insurance Co. of North America,* 315 S.C. 1, 431 S.E.2d 577 (1993), the Court answered this question and held that S.C.Code Ann. § 38–77–140 (Rev.1989), the statute mandating that automobile policies provide coverage for damages arising out of the "use of a motor vehicle," limited the vehicle's use to transportation uses.

Here, the Geo Tracker was being used for transportation purposes. As a result, even if the trial court should have independently analyzed whether the Tracker was used for such a purpose, any failure to do so was harmless error because the stipulated facts show the court could not have reached any conclusion other than the Tracker was being used for transportation.

### III. AFFIDAVIT

■ State Farm contends the trial court erred in considering an affidavit submitted by the Bookerts in support of their

summary judgment motion because the case was submitted on stipulated facts.

When counsel enter into an agreed stipulation of fact as a basis for decision by the court, both sides will be bound by such agreed stipulation, and the court will not go beyond such stipulation to determine the facts upon which the case is to be decided. *Belue v. Fetner,* 251 S.C. 600, 164 S.E.2d 753 (1968).

The affidavit contains a short statement by Andre Ervin Christian, the assailant who shot Michael Bookert. The statement reads: "The Geo Tracker was moving when the nine milimeter [sic] weapon went off or discharged." This statement is substantially similar to Stipulation of Fact # 16, which reads: "An instant later while said Geo was still moving forward, the soldier in the front passenger seat of the Tracker fired the nine millimeter, hitting Michael Bookert with two bullets, one in each leg."

We find no reversible error as the substance of the affidavit was merely cumulative to several of the stipulated facts.

## CONCLUSION

The trial court properly reformed the insurance policy issued by State Farm to Mary Bookert because it was inconsistent with S.C.Code Ann. § 38–77–160 (Supp.1996). Applying the reformed policy to the factual record, we conclude there was a causal connection between the Geo Tracker and Bookert's injuries; there existed no act of independent significance breaking the causal link; and the Tracker was being used for transportation purposes. The use of the Geo Tracker was "ongoing" and the vehicle was an "active accessory" to the assault upon Bookert. Moreover, the use of the vehicle and the shooting were "inextricably linked" as one continuing act. In light of the *Howser, Towe,* and *Carraway* decisions, we hold Bookert's injuries resulting from the gunshot wounds are covered pursuant to the reformed underinsured motorist provision in the State Farm policy at issue. Accordingly, the trial court's order finding underinsured motorist coverage was available is

**AFFIRMED.**

CONNOR and HUFF, JJ., concur.